opinion that the objections on which the demurrer is allowed may be avoided in a new indictment, it is directed that the case be submitted to the next grand jury.

(127 App. Div. 948.)

## SNOW v. WATHEN.

(Supreme Court, Appellate Division, Fourth Department. July 7, 1908.)

1. CONTRACTS—CONSTRUCTION—SERVICES—IMPLIED AGREEMENT.
    One who held himself out as a professional and skillful trainer of horses for racing purposes, in accepting horses, impliedly agreed to use the best skill, experience, and judgment he possessed in developing the speed of such horses and in managing the same in races.

2. SAME.
    One who agreed to train horses for racing purposes, and to drive the same, was not in any sense a guarantor that they would win races, but only responsible for their proper training and skillful driving.

3. DAMAGES—BREACH OF CONTRACT.
    One who agreed to train horses for racing purposes, and to drive them, should not only be deprived of his wages, but made to respond in damages, if he pursued the manifest policy of keeping a horse below his true speed to discourage his owner into selling him to himself or others acting with him.

4. CONTRACTS—SERVICES--BREACH.
    Whether a horse, taken to be trained for racing purposes, should be worked in company or alone, was a matter wholly in the trainer's judgment; and, in the absence of proof showing an improper purpose, it should be concluded that the trainer was prompted by an honest desire to produce the best results.

5. SAME.
    One who agreed to train horses for racing purposes, and to drive them, in making expenditures for the keep of the horses, was required to exercise the care a prudent man would in making like purchases.

6. FRAUD—PRESUMPTIONS AND BURDEN OF PROOF.
    The presumption of honesty prevails, unless overcome by irresistible evidence of double dealing on the part of him in whose aid the presumption arises.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, §§ 46–50; vol. 20, Evidence, §§ 82, 84.]

7. SAME.
    No fraudulent design or purpose in rendering statements as to expenditures for the keep of horses can be imputed to one who took the horses to train for racing purposes and to drive, because of the fact that he received a discount of 33⅓ per cent. from the blacksmith who attended him at the race meeting, in view of the explanation that the discount was made in consideration of services and good offices rendered in securing other work for the blacksmith.

8. CONTRACTS—CONSTRUCTION—REIMBURSEMENT FOR EXPENDITURES.
    Where the expense of a whole string of race horses for feed, care, transportation, and bedding, and the personal expenses of the trainer and driver, was divided by the whole number of horses, and each owner charged with the amount thus ascertained on account of each horse in the string, such method may be regarded as a close approximation of the proportional expense each owner was to bear, and a substantial compliance with the agreement, though it was not absolutely accurate, because assuming that each horse ate the same amount of feed and had personal care to the same extent.

9. PRINCIPAL AND AGENT—IMPLIED AUTHORITY.
    One employed to drive a race horse had not implied authority to receive a purse won by the horse.

Appeal from Judgment on Report of Referee.

Action by William L. Snow against J. B. Wathen. Judgment for plaintiff, and defendant appeals. Affirmed, on the opinion of referee.

The following is the opinion of Referee Carter:

The agreement between the parties to this action, and upon which the defendant's horses were delivered to the plaintiff for training and driving, was simple and direct in its terms. The compensation to the plaintiff of $25 per month for each horse handled by him at his home stables and track, and $60 per month when he was away from Hornell, either at other training tracks or in the circuit races, is not questioned, as I understand it; and his right to recover that compensation is not challenged, unless it should be found that he failed or neglected to use honestly his skill and judgment as a trainer of racing horses, so as to develop the best speed attainable in the horses which the defendant intrusted to his care and training, or unless he perpetrated a fraud upon his employer. The plaintiff held himself out to the world as a professional and skillful trainer and fitter of high-grade horses for racing purposes, and in accepting defendant's horses he impliedly agreed to use the best skill, experience, and judgment he possessed in developing the speed of such horses and in managing the same in the races wherein they should be entered. The defendant was entitled to the best results attainable, and these the plaintiff impliedly agreed to produce.

The horses which defendant delivered were confessedly of a high grade, and capable under proper training of showing no mean qualities of speed and endurance. Whether they were sufficiently swift to compete successfully in the races of the Grand Circuit was a risk which their owner assumed. The plaintiff was not in any sense a guarantor that they would win races. He was only responsible for their proper training and skillful driving. The defendant insists that the plaintiff did not prosecute his duties with the zeal and skill calculated to produce the best results; that especially in the case of O. H. W. his manifest policy was to keep him below his true speed, for the purpose of discouraging defendant into selling him to plaintiff, or to others acting conjointly with him, for much less than his true value. If the defendant were right in this contention, then it would follow, both in law and in morals, that the plaintiff should not only be deprived of his wages, but should be made to respond in damages for the wrong he had done his employer. In considering the criticisms of the defendant, we must remember that he was no novice in the racing business, but had had considerable experience with race horses, and from his experience in that field it may be assumed that he was capable of determining whether or not his horses were properly trained. With this in mind, and the added fact that he joined the plaintiff in July, 1904, at a race meeting, and thereafter accompanied him at nearly all, if not all, of the subsequent meetings during that season, and saw his horse under training, and thus had the fullest opportunity of watching and judging the quality of the work of the trainer with reference to both O. H. W. and Margaret W., it is passing strange that he should not have found fault with the trainer's methods, if they were not to his liking or in accord with his views. His was a practiced eye, and it is difficult to conceive, that any neglect of so serious a character as now urged should have escaped his condemnation.

There is not in the record any evidence of any criticism at that time with what was being done, or even a suggestion that a different policy should be pursued with reference to either of these horses. As late as February 21, 1905, the defendant, in writing to the plaintiff, excusing his failure to pay plaintiff's bill, writes: "If I succeed in getting some money, which I am expecting to get hold of within the next 30 days, I will not sell him [O. H. W.], but will let you train to perfection, and then either race him or sell him— rather think will let you race him." As late as July 14, 1905, and long after

this action was commenced, defendant writes plaintiff with reference to O. H. W., saying: "I would prefer your keeping him, as you understand him better than any one else, and can get him in shape quicker on that account." Surely, it is safe to conclude that when the defendant wrote those letters his faith in the plaintiff, either as a trainer or as a driver in the race, had not been shaken; but it is suggested that defendant had not then learned the facts. Beyond the circumstances of the changing of the weight of the shoe, I am unable to find any fact discovered by the defendant subsequent to the writing of the letter referred to, which would account for the radical change in his regard for the plaintiff's skill and integrity as a trainer and driver. The conclusion that the changing of the shoe was done, or consented to, for the purpose of impairing the speed of the horse, is not permissible under the proofs. The plaintiff insists that he made no change in the shoes which would lessen the horse's gait.

Again, the defendant complains that the horse O. H. W. was not worked in company; but the fact that this omission was not seriously urged till the trial weakens the force of the criticism, especially in view of the undisputed evidence of the plaintiff that he worked him in company, and made the mile in 2:19 and a fraction, and then worked him alone and made the mile in 2:14¾, and that he did not hold him in either of these tests to prevent his speed. This was a matter wholly for the driver's judgment, and, in the absence of any proof showing an improper purpose, it should be concluded that the trainer must have been prompted by an honest desire to produce the best results. Mere suspicion would not furnish a sufficient foundation for the charge of dishonest purposes or ulterior motives.

It is contended by the defendant with considerable earnestness that the plaintiff rendered false statements as to the amount of his expenditures in providing for the keep of the horses, particularly while they were at the several race meetings. Some testimony was adduced showing the market value of the products for which the charges were made. The difficulty of obtaining any satisfactory evidence on that subject is apparent, when we come to consider the liability of prices varying at the different places of meeting. The plaintiff should not be controlled by estimates and opinions as to fair market values. Naturally he was obliged to pay what was demanded, and the question to be considered here is: What did he actually pay, and did he exercise the care a prudent man should in making his purchases? This was the duty he owed his employer in reference to these particular matters. The itemized statements were rendered defendant monthly, during all the period in which these articles were purchased, and that he was promptly advised of the character and extent of the charges being made against him is not denied; nor does it appear that he ever challenged the correctness of the charges until after this action was brought. The defendant wrote several letters to the plaintiff at about the time this action was commenced, yet in not one of them does he raise the slightest objection to the claim, or to any item thereof. On the contrary, he unqualifiedly promises to pay the whole thereof. On February 21, 1905, he says he will sell some stock, and prays the plaintiff to "indulge him a little longer." March 13th he writes: "Can't you use my say four months' note for the balance I owe you with the horse as collateral? I appreciate your kindness in waiting so long." March 15th, and after notice of suit had been received by him, he writes a long letter, without challenging the claim in any particular, but does write that he will insist on credit for the stake moneys which he paid to the driver of his horse at Youngstown, Ohio, if the suit is pressed, and closes his letter with the statement that out of the proceeds of the sale of one of his horses he had expected to pay a part of plaintiff's bill. April 18th he incloses a check for $500 to apply on the claim. May 9th he writes, proposing to send a $500 or $700 note, with note of R. E. Wathen & Co. for $1,000 as collateral, in addition to the horse. May 12th he expresses the hope that he may realize from the sale of some stocks, and then be able to pay the money. May 30th he asks the plaintiff's pardon for not having sent him more money. July 18th he writes: "I can only repeat what I have said. I wish I had the money to pay you in full now." These letters force the conclusion upon me that the

statements rendered by the plaintiff were correct, and so regarded by the defendant.

Undoubtedly any fraud practiced by the plaintiff upon the defendant would have destroyed the effect of the receipt and retention by the defendant of the itemized bills without protest; but such fraud must be inferred from clear proofs, and cannot be predicated upon mere suspicion. In other words, the presumption of honesty prevails, unless overcome by irresistible evidence of double dealing on the part of him in whose aid the presumption arises. It is true that the plaintiff received a discount of 33⅓ per cent. from the blacksmith, who attended him at the race meeting; and, while I do not believe that was a prudent thing to do, yet, in view of the explanation of the plaintiff that this discount was made to him in consideration of services and good offices rendered by him in securing other work for the blacksmith, I am of the opinion that no fraudulent design or purpose can thereby be imputed to the plaintiff on account of that circumstance. That arrangement was in its nature a shadow, rather than a substance.

In determining the proportional expense the defendant was to bear and pay while his horses were away from plaintiff's home stable at Hornell, the expense of the whole string of horses for feed, care, transportation, and bedding, and personal expenses of plaintiff after leaving the training tracks proper, was divided by the whole number of horses, and the owner of each horse was charged with the amount thus ascertained, on account of each of the horses in the string owned by him. This method assumes that each horse ate the same amount of feed and had personal care to the same extent. Strictly speaking, this could hardly be said to be absolutely accurate, but may be regarded as a close approximation and a substantial compliance with the terms of the agreement, and that it was so regarded by the parties is evidenced by their assent thereto. The defendant in this action seeks to reopen his account with the plaintiff for the training, keeping, and driving of the horses Mary Anna and Margaret W. in the year 1903. That account was fully settled, adjusted, and paid more than a year before this suit was instituted. The claim was settled upon itemized bills rendered, and presumably upon full knowledge at the time of their correctness. I do not find any fact or circumstance that would justify a reopening of that settlement.

It may, however, be proper to refer to one matter growing out of that transaction, and that is the stake moneys referred to by the defendant in his letter of April 5, 1905, to the defendant. It appears that this horse, Margaret W., after consultation between the owner and the trainer, was entered by the latter in the name of the former for a certain race at a trotting exhibition to be held at Youngstown, Ohio, in the fall of 1903; that the plaintiff went to Youngstown, and his horse was driven in the race for which he was entered by a driver named Erskine, employed by the plaintiff. The horse won in the race, and the person entering the horse became entitled to draw the purse, less the entrance fee. The defendant received the money, amounting to $320, and, instead of keeping it and turning it over to the plaintiff, he delivered it to Erskine, who failed to give it to the plaintiff, but used it for his own purposes. The defendant claims that the plaintiff should give him credit for this money. It is not pretended that it ever came to the possession of the plaintiff; but it is urged that, because Erskine was a servant of the plaintiff, payment to him was a good payment to plaintiff. To this contention I cannot yield my assent. It was the duty of the defendant to ascertain before parting with the money that Erskine was authorized by the plaintiff to receive moneys for him. Erskine's authority to receive these moneys for plaintiff could not be implied from the bare fact that he was employed by the plaintiff to drive horses. It was not in the power of the defendant to authorize this driver to receive moneys for his master. That power was vested in the plaintiff alone. It is perfectly clear that the defendant constituted Erskine his special agent to carry the money to the plaintiff, and the failure of Erskine to execute his commission is the loss of the defendant, and not that of the plaintiff.

It is not intended by what has been said to cast any reflections upon the defendant. He was frank and candid in the assertion of his contentions. Naturally he took a great pride in his horses and had an abounding faith

in their capabilities. It is not strange that he was disappointed in the results obtained; but, after consideration of the proofs before me, I find no reason for attributing the causes of failure to any misconduct on the part of the plaintiff.

M. F. McNamara, for appellant.
Orcutt, Robbins & Brown, for respondent.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

PER CURIAM.   Judgment affirmed, with costs, on the opinion of Carter, referee.

(127 App. Div. 510.)

### PEOPLE v. SCHLESSEL.

(Supreme Court, Appellate Division, First Department.   July 8, 1908.)

1. FRAUDULENT CONVEYANCES—CRIMINAL RESPONSIBILITY—OFFENSES—INDICTMENT—SUFFICIENCY.
   An indictment charging that accused "committed the crime of removing property with intent to defraud a creditor, committed as follows," that accused, being indebted to a person named and to divers other persons in divers sums, with intent to defraud said persons and others, being his creditors, and to prevent the property thereinafter described from being made liable for the payment of his debts or levied on by execution or warrant of attachment, unlawfully did remove, assign, and convey to a person named a certain bank check described, etc., charges but a single crime, in violation of Pen. Code, § 587, punishing a person, who, with intent to defraud a creditor, or to prevent any of his property being made liable for the payment of any of his debts, or levied upon by an execution or warrant of attachment, removes any of his property, or secretes, assigns, conveys, or otherwise disposes of the same.

2. SAME.
   To show a violation of Pen. Code, § 587, providing that a person who, with intent to defraud a creditor, or to prevent any of his property being made liable for the payment of any of his debts, or levied upon by execution or writ of attachment, removes any of his property, or secretes, assigns, conveys, or otherwise disposes of the same, shall be guilty of a misdemeanor, it is not essential to show that there was any creditor who could have levied on the property by virtue of a warrant of attachment or an execution issued on a judgment, and a debtor cannot fraudulently dispose of his property before the indebtedness is due.

3. INDICTMENT AND INFORMATION—DUPLICITY—JOINDER OF OFFENSES—ALTERNATIVE ACTS CONSTITUTING OFFENSE.
   Where a crime may be committed by the doing of several acts in the alternative, they may all be included in one count, and a conviction had on proof of the commission of any one, without proof of the commission of the others.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 351.]

4. SAME.
   The bare fact that an indictment in one count describes more than one crime does not make it defective, provided that the accused is charged with the commission of only one crime.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 335, 337–371.]