### PIUNTKOSKY v. THOMAS HARRINGTON'S SONS CO.

(Supreme Court, Appellate Division, Second Department. April 16, 1915.)

1. RELEASE ⬉⟶38, 55—ESTABLISHMENT OF RELEASE—BURDEN OF PROOF.
    A release interposed as a defense to an action for a personal injury negligently inflicted bars a judgment, but the burden of establishing it is on defendant, who, after making out a prima facie case, by proving its execution and introducing it in evidence, is entitled to judgment, unless plaintiff establishes his plea of avoidance.
    [Ed. Note.—For other cases, see Release, Cent. Dig. §§ 49, 50, 94–108; Dec. Dig. ⬉⟶38, 55.]

2. RELEASE ⬉⟶57—MENTAL CAPACITY—EVIDENCE—SUFFICIENCY.
    Evidence *held* not to sustain a finding that plaintiff, who released a claim for a personal injury, was mentally incompetent.
    [Ed. Note.—For other cases, see Release, Cent. Dig. §§ 106–108; Dec. Dig. ⬉⟶57.]

Appeal from Trial Term, Kings County.

Action by John Piuntkosky against the Thomas Harrington's Sons Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and BURR, CARR, STAPLETON, and PUTNAM, JJ.

Edward A. Brown, of New York City, for appellant.

Henry M. Dater, of Brooklyn (Jay S. Jones and Edward J. Fanning, both of Brooklyn, on the brief), for respondent.

JENKS, P. J. The plaintiff, landing from a ferryboat in Jersey City, came into collision with the truck team of the defendant, so that his legs were injured by the front wheel of the truck. The defendant answered the plaintiff's complaint for negligence by general denials and by a separate defense of a release. The plaintiff joined issue as to that defense. Although the proof upon that issue presented for the jury a question whether the plaintiff was competent mentally to understand and to appreciate what he was doing when the release was executed (Dixon v. Brooklyn City & Newtown R. R. Co., 100 N. Y. 170, 3 N. E. 65; Scully v. Brooklyn Heights Railroad Co., 155 App. Div. 382, 140 N. Y. Supp. 260), the verdict for the plaintiff that necessarily disregarded that instrument is against the weight of evidence.

[1] In Perry v. O'Neil & Co., 78 Ohio St. 200, 225, 85 N. E. 41,

_____

⬉⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

49, cited by us in Griffith v. American Bridge Co., 157 App. Div. 264, 142 N. Y. Supp. 199, it is said:

"The release as a defense does not negative the plaintiff's cause of action, but is a bar to a judgment upon it, and the burden of proof to establish it is upon the defendant; but there is a distinction between the burden of proof and the burden of evidence, or the burden to go forward with the evidence."

After the defendant had made out a prima facie case as to the execution of the release and had read that instrument in evidence, the plaintiff had to go forward to establish his plea of avoidance, which was his mental incompetency at the time of execution. Authorities supra; Jones v. Jones, 137 N. Y. 610, 33 N. E. 479; Doheny v. Lacy, 168 N. Y. at page 220, 61 N. E. 255; Staples v. Wellington, 58 Me. 453; Chicago W. D. Ry. Co. v. Mills, 91 Ill. 39.

[2] The accident occurred on October 9, 1913. The plaintiff was taken forthwith to the Jersey City Hospital, and remained there as a patient until the 28th of that month. With the exception of October 12th, his contention is that throughout his stay in the hospital, from the time of his reception until October 27th, the day before he went therefrom to Bellevue Hospital, New York City, he was irrational. The release was executed on October 24th, and hence his alleged irrationality existed at that time. The irrationality, according to his testimony, was oblivion. He testifies that he could recall none whom he saw, save his wife, when she came on the 12th of October. He cannot recollect doctors, nurses, attendants, fellow patients, or visitors. He knew nothing of any release, or of any money paid to him for a release. Such and similar testimony is entirely consistent with his alleged condition of mentality.

But the defendant produced an affidavit which purported to be executed by the plaintiff at the time of the execution of the release. Now, when the plaintiff was examined by his counsel as to the contents of that affidavit, he denied categorically that he had ever made any of the statements attributed to him as the affiant. But consciousness at the time was essential to such kind of testimony. Before he could testify that he never saw the release until it was shown to him at a former trial, he must have been conscious that he had not seen it theretofore. To be consistent with his theory of unconsciousness, he could but testify that he did not know whether he had said or had done the things charged to him. He is inconsistent with his theory the moment he asserts that during that period he did not do or did not say any particular thing. Almost immediately upon cross-examination he said that he had no recollection of what took place in the hospital save on October 12th, and in answer to the question whether he denied the signature of the papers, he said, "I don't know."

These answers are consistent with his alleged unconsciousness. But, in answer to the very next question, as to whether he might have signed it (the release or affidavit) and yet forgotten, he said that he hardly believed that he could forget about it, if he had done it. This implies that he could have remembered his act. And then, after a question or two, he denies positively that he ever talked to a nurse, Miss O'Neil, or knew an orderly named John, or patients named Best or Schwem-

ler. Denials are based necessarily upon consciousness. An essential attribute, of unconsciousness is ignorance. The plaintiff rests his answers now on a state of sensibility, and again on a state of insensibility, existing at one and the same time, during which he says he was uniformly unconscious.

There is no doubt that within a few days after October 9th the plaintiff was attacked with delirium tremens, so that he became irrational and so violent that for a time he was confined in a cell. He was accustomed to strong drink, and there is cogent evidence that he was under its influence at the time of the accident and when he was received into the hospital. There is nothing, then, abnormal in the development of this attack in a man of such habits, who suffers from such an accident and is put under the restraint of medical treatment. It is upon this irrationality that the plaintiff relies, and the question is whether it existed on the 24th of October. His wife testified that she saw him on the 12th of October, when he assented to her retaining a lawyer, but that thereafter, both then and on the days of her subsequent four calls, he did not seem to understand her, but turned away when she sought to talk with him. Plaintiff's long-time friend Schneider, who testifies that he called on October 23d, further testifies that the plaintiff did not respond to his inquiries, but turned his head aside and muttered to himself. And plaintiff's sister-in-law, Smith, who testifies that she visited the plaintiff on October 23d, further testifies that he made no answer to her inquiries, but only muttered to himself. Aside from the proof thus summarized, there but remains the testimony of the experts, which I shall consider later on.

The proof of the defendant is that the irrationality of the delirium tremens ceased on October 16th, and that on that day the plaintiff became and thereafter remained rational. This proof consists of the testimony of the hospital physician, who treated the plaintiff, of the head nurse in charge of the ward of the hospital, of four other nurses, of a physician employed by the defendants to examine the plaintiff, of a fellow patient, and of the medical charts (read in evidence without objection), giving the patient's history in detail from day to day, which contained statements of his irrationality and of his restoration to rationality. The testimony of these witnesses is clear and positive. Their conclusions were drawn from daily observations, and, in many instances, daily conversations with the patient.

To my mind, there is a very strong piece of evidence against the plaintiff in a letter received by the head nurse, Miss F. Reptic, through the mails, and addressed to her, which purported to be written from Bellevue Hospital by the plaintiff. A fac simile of the letter is in the record, and the proof to my mind is overwhelming that the plaintiff indited it, although he but "guesses" that the signature is his, but is "not sure." The letter relates to the condition of the plaintiff, refers to the writer's stay in the Jersey City Hospital, contains the writer's regards to Mr. Best, his best regards to George, the "day ordoly," as "it is. a very few you meet as good as he is," asks that George write to the writer, and closes:

"Also my Brooklyn friend, Miss Oniel, I thank her for all the good turns she done for me."

Mr. Best was a fellow patient of the plaintiff. George was an orderly in the hospital. Miss O'Neil was a nurse who lived in Brooklyn, who testifies that she and the plaintiff had talked about that borough while he was a patient. And yet the plaintiff had testified that he could not recall whether he ever saw Miss Reptic, a nurse, save that he saw a woman on the day before he left the hospital who was so called, that he never talked with Miss O'Neil, a nurse, that he did not recall any orderly named John, or any fellow patient named Best. Of course, if he could recall them, that was proof of his consciousness at a time when he insisted his mind was a blank.

The two physicians called by the plaintiff, who testified to the plaintiff's irrationality on October 24th, were experts who responded to hypothetical questions which included the testimony of the plaintiff and his witnesses to his mental state during his stay in the hospital, but did not embrace any of the testimony of the defendant's witnesses as to his rationality. One admitted that, if he considered the chart entries as correct, he could not testify that the plaintiff was irrational from October 16th on; but he might have been irrational, and not have been observed. And the other witness on cross-examination said that the testimony of the plaintiff that he had no recollection of what took place in the hospital had "a great deal of weight" with him, and that if the plaintiff and four nurses were at variance he would be inclined to think that the nurses were right.

The release was obtained by Mr. Brockhurst, an attorney at law and a master in chancery of New Jersey. He was the attorney for the defendant in its New Jersey affairs. He testifies that he went to the plaintiff, ascertained that he had no attorney, and talked over a settlement with him. After the plaintiff and he had agreed upon $160 as a settlement, the latter prepared an affidavit, wherein the plaintiff deposed that he had no lawyer, that he desired to settle the case, that he was satisfied with $160, that he had read the release about to be signed and understood it and its effect, that his willingness to settle the case was his knowledge that he had been drinking at the time of the accident, that the driver of the team was not entirely to blame, as deponent was under the influence of liquor and staggered into the horse, that the driver could not stop his team until the front wheel of the truck struck and broke deponent's leg, and that he did not blame the driver.

Mr. Brockhurst testifies that he prepared the affidavit in the presence of the plaintiff, from data obtained from him; that he read it to the plaintiff, who took it from him, appeared to read it, and then signed it and swore to it; and that then he read the release to the plaintiff, who took it and read it and signed it. Mr. Brockhurst then asked the head nurse (Miss Reptic), whom he did not know at the time, to witness it, which she did after Mr. Brockhurst had interrogated the plaintiff in her presence. Thereupon he paid $160 to the plaintiff.

Miss Reptic corroborates this witness as to these statements, and says that the plaintiff was perfectly rational, that he took the money, counted it, and put it under his pillow, but later in the day, upon her representation that the hospital would not be responsible for it, the

plaintiff, who said he wished to give it to his wife, gave it to the witness, and she sent it down to the office for safe-keeping. Subsequently the money was given to the plaintiff's wife by Miss Reptic.

Schwemler, a fellow patient, testifies that after the transaction he asked the plaintiff if he had not been foolish "to sign for that amount," and that the plaintiff replied that he did not wish the trouble of taking the case to court, and that he was satisfied. Dr. Hepler, the hospital physician who treated the plaintiff, testifies that the plaintiff told him that he had received money in settlement, and Miss Schwarz, the night nurse, testifies that she talked on that day with the plaintiff about the settlement. Dr. Nuse did not see the execution of the papers, but he saw the money pass, the plaintiff apparently count it over and place it under his pillow, and thereafter the witness talked with the plaintiff as to his condition.

Although the trial court did not err in the submission to the jury of the question raised by the pleading of the release, I think that it could have well set aside the verdict for the same reason that compels us to reverse this judgment, namely, that upon the proof the plaintiff was not entitled to an avoidance of that instrument. I shall not discuss the question of liability, but this omission is not to be taken as favorable to either party. The release was a vital issue, and before the plaintiff could recover he must be freed from its effect. Blair v. Utica & Mohawk Valley Railway Co., 112 App. Div. 609–612, 98 N. Y. Supp. 614.

When a case of negligence involves a release, it seems that such issue is often disregarded by a jury if it is convinced that the defendant is liable upon the issue of negligence. Such course is an exhibition of sympathy with suffering. And explanation may be found if the consideration for the release appears to the jury inadequate compensation for the injuries. Very recently we have expressed an opinion of the propriety of an exercise of discretion by the court to order a separate and prior trial of an issue raised by an affirmative defense of a release, in a case of negligence. Warner v. Star Co., 162 App. Div. 458, 147 N. Y. Supp. 803.

The judgment and order are reversed, and a new trial is granted; costs to abide the event. All concur.