In the Matter of the Estate of MARY TIMKO, Also Known as MARIE TIMKO, Deceased.

Surrogate's Court, Kings County, March 13, 1934.

*Clement F. Rozanski*, for the petitioner.

*Louis V. Vagnino [William G. McLaughlin* of counsel], for the respondent.

WINGATE, S. The reasonably active imagination of the court is unable to conceive of a more bizarre, not to say fantastic, record than that which was evolved in this case after an exceptionally acrimonious trial occupying three full court days. The parties initiated their excursion into the realms of the unusual by a waiver of the provisions of section 347 of the Civil Practice Act, which inhibits the introduction of the testimony of interested parties in relation to personal transactions with the decedent, and with this inauspicious beginning, launched into a welter of wholly incompetent and irrelevant testimony and collateral issues which the efforts of the court seemed wholly unable to check.

The controversy concerned itself with the comparatively insignificant sum of $871.70. The ultimate question at issue was whether two savings bank accounts of the decedent, one in the usual " Totten " trust form in the name of decedent " in trust for " her daughter Mary, and the other in statutory joint account form in the name of the decedent and Mary, " to be drawn by either or the survivor," which accounts aggregated $1,743.39, were the sole property of Mary, or belonged to the estate and were, therefore, equally divisible between Mary and her sister Elizabeth as decedent's residuary legatees.

The few pertinent and uncontroverted facts which are deducible from the 239 page record are that decedent, who was a Slavonian, became a widow in 1913 and from that time until her death, which occurred on July 11, 1933, supported herself from her own assets and managed her own affairs, renting, buying and selling houses and collecting and investing and reinvesting her funds. She was approximately sixty years of age at the time of her death.

Her daughter Elizabeth married in the early part of 1920, subsequent to which the decedent and her daughter Mary lived together

for the greater part of the time up to Tuesday, June 27, 1933, when Elizabeth and her husband came and took decedent to their house where she died exactly two weeks later.

The joint account was opened on November 24, 1925, and shows eighty-five credits up to the time of its closing on August 5, 1933, of which twenty-six are designated as interest. During this period fifty-three withdrawals were made, thirty-nine on drafts signed by decedent, and fourteen on ones bearing the signature of the daughter Mary.

The " trust account " was opened on September 13, 1928, and shows thirteen deposits and but three withdrawals prior to the closing thereof.

In addition to these two accounts, decedent maintained an account in her own name in the Williamsburgh Savings Bank, opened at some undisclosed time prior to November, 1923, in which the balance at death amounted to $435.62.

It was demonstrated on behalf of the respondent sister, who is seeking to avoid the natural effect of the manner in which the accounts stood, that the decedent " had a very keen mind," " had full control of her faculties until four days before her death," and that she was a good business woman. All three bank books were in her possession in her bureau drawer up to June 27, 1933, and having apparently inadvertently left them at her home when she was moved to Elizabeth's house, she sent her son-in-law for them at eight A. M. the following morning.

In view of the establishment of decedent's somewhat unusual business capacity, the solicitude which she exhibited respecting the savings bank books, and the fact that she simultaneously maintained accounts in all three of the usual deposit forms, and indicated in her conversations respecting them a full realization of their differing legal attributes, a strong inference is raised that she fully comprehended the legal results of her acts in opening and continuing them, and intended such consequences. It is wholly inconceivable that a woman of her demonstrated character and abilities would have given any other person any authority over an important part of the possessions, which were her sole means of subsistence, without detailed inquiry as to the results of her acts, and it is utterly preposterous to suppose that during the six years and a half that the joint account book was in her possession, she would have failed fully to inform herself as to the purport of the legend clearly stamped in red in the joint savings bank book at the place where the names of herself and Mary were entered as depositors: " To be drawn by either or the survivor."

It is, of course, true, as pointed out in *Matter of Fenelon* (262

N. Y. 308, 311), that in determining the applicability of section 249 of the Banking Law, the question concerns the mode in which the deposit was initially made, and that where, as in that case, there was a difference between the legend on the signature card and on the bank book, the former must control. It is equally certain, however, as indicated by the result attained in the earlier opinion in the same case (262 N. Y. 57), that a demonstration in respect to the latter raises a factual inference that the two correspond.

In the case at bar the production in evidence of the bank book and the demonstration that the account was therein entered in this form, with the other noted facts, raised an inference that it was so made on the books of the bank by direction of the owner. This was, of course, a rebuttable inference, but the burden of going forward with a contrary demonstration was placed squarely upon the person who contended to the contrary.

In this situation the construction and effect of section 249 of the Banking Law enunciated in *Moskowitz* v. *Marrow* (251 N. Y. 380), and in *Matter of Porianda* (256 N. Y. 423), become pertinent. No good purpose would be accomplished by their review at this time, since they were fully considered by this court in its opinion in *Matter of Hill* (145 Misc. 631).

It follows, therefore, as a matter of law resulting from these pronouncements of the Court of Appeals that, on the facts shown in the record of the case at bar, the sole title to the avails of the joint account passed to Mary in the absence of fraud or undue influence on her part, which subject will be considered later.

That a like effect resulted in respect to the account in trust form is incontrovertible not only on the authorities (See *Matter of Vaughan*, 145 Misc. 332; *Matter of Richardson*, 134 id. 174; *Matter of Kive*, 139 id. 273; *Matter of Rasmussen*, 147 id. 564, and cases reviewed in these opinions), but also by virtue of the extract from the by-laws of the bank printed in the back of the bank book.

Whether or not the surviving joint tenant and *cestui que trust* is entitled to retain the proceeds of these accounts for her sole use, or must surrender them to the estate, depends on two demonstrations, *first*, whether there is any showing of pertinent " fraud or undue " influence on her part, and, *second*, whether there is an adequate demonstration of an agreement by her to hold the proceeds on a trust for the estate. On both of these questions the burden of proof rests upon respondents who seek to charge her.

It is, of course, primary that fraud or undue influence will not be presumed, but must be proved by the person alleging their perpetration. (*Guidet* v. *N. Y., L. E. & W. R. R. Co.*, 9 N. Y. St. Repr. 26, 28; reported by memorandum only, 44 Hun, 628;

affd., 120 N. Y. 649; *Schultz* v. *Hoagland*, 85 id. 464, 467; *Steinberg* v. *New York Life Ins. Co.*, 238 App. Div. 206, 210; *Snow* v. *Wathen*, 112 N. Y. Supp. 41, 44; reported by memorandum only, 127 App. Div. 948.)

It was said in the opinion last cited, " the presumption of honesty prevails, unless overcome by irresistible evidence of double dealing on the part of him in whose aid the presumption arises." Whereas to this court the inclusion of the word " irresistible " in the quoted statement savors somewhat too strongly of the " irrefragable " nature of the proof required by *Caujolle* v. *Ferrie* (23 N. Y. 90, 108) to overturn the true presumption of legitimacy (*Matter of Callahan*, 142 Misc. 28, 35; affd., 236 App. Div. 814; affd., 262 N. Y. 524), to render the statement absolutely correct, there is unquestionably a strong factual inference of fair dealing which one seeking to recover by reason of alleged contrary conduct must overcome. (Cf. *Matter of Mullin*, 143 Misc. 258, 259, 262.) Similar considerations apply to the burden of proof respecting the existence of a trust. (*Matter of Beaman*, 163 N. Y. Supp. 800, 802, not otherwise reported; *Matter of Weber*, 118 Misc. 653, 655; see, also, *Jones* v. *Jones*, 137 N. Y. 610, 613; *Piuntkosky* v. *Harrington's Sons Co.*, 167 App. Div. 117, 118.)

The existence of fraud on the part of the daughter Mary was asserted, but the acts attempted to be proved in substantiation bore no conceivable relation to the opening of, or continuance in their existing form, the two bank accounts in question.

It is obvious that the fraud or undue influence which, under the wording of the statute, will effect an avoidance of the presumption which it creates, must bear some direct relation to the account itself.

The acts here attempted to be proved were, *first*, that she made an allegation in the petition for probate of decedent's will that she was a citizen, when she technically was not; *second*, that she instigated the execution of a false affidavit to enable the respondent and herself to collect on insurance policies payable to them as individuals; *third*, that she made an alleged promise to the respondent to share the proceeds of the bank accounts with her; *fourth*, that she removed certain papers of the decedent from her former residence after the latter had been taken to respondent's home; and finally, that she failed to testify on the trial respecting the events which took place at the time the bank accounts were opened.

It must be obvious from their mere enumeration that none of these things could or did have any bearing whatsoever on the right given her by law to a survivorship ownership of the accounts and that they can have no conceivable pertinency to the issues in this

case. In the interest of a fair presentation of the facts, however, each will be briefly noted.

Petitioner did allege that she was a citizen when she was not. She was, however, born in this country and lost her citizenship by reason of marriage to a resident alien. This alien served in the armed forces of the United States during the war, which many persons believed *ipso facto* conferred citizenship, on the theory that one who was good enough to die for the country was good enough to live for it. It was further testified without contradiction by her attorney that she was surprised to learn that she was not a citizen and that she obtained citizenship papers promptly upon the question being raised. It seems apparent, therefore, that she was, in this connection, merely laboring under a wholly immaterial and quite understandable mistake of law.

The alleged false affidavit was executed by her uncle, who testified that he made the affidavit pursuant to the directions of the insurance agent and apparently according to the best of his information and belief.

The removal of the papers was open, and occurred at a time when the decedent was on her death bed, and within a few days of death. On the trial petitioner testified that it was done pursuant to the direction of her mother, and the court sees no reason for doubting the veracity of this statement. The whole matter is wholly immaterial in any event, since there is no intimation that they were not all duly delivered to the attorney for the estate, and are not now present as assets therein.

The alleged promise to the respondent of a division of the accounts, if actually made, on which subject the views of the court will later be expressed, was wholly without consideration and void. Up to the moment of her death, the decedent, and she alone, had the power to defeat the survivorship rights of the petitioner. The respondent was as much a stranger to them as if wholly unrelated. As a matter of strict fact, it seems apparent from the testimony of the respondent and her husband that they went to rather unusual lengths in trying to have the bank accounts changed so as to eliminate the petitioner, and were thwarted in their desires merely because the decedent refused to act in the matter.

Finally, petitioner *did* testify as to what was done when she went down to the bank at her mother's request " and put my name on her book." If respondent was dissatisfied with the facts elicited on the direct examination, unlimited opportunity for cross-examination on the subject was available. Of this she chose not to avail herself. In any case in view of the preliminary demonstration respect-

ing the state of the books and their six and a half year continuous retention by the decedent, the burden was on respondent and not on petitioner to go forward with testimony to the effect that the statutory survivorship rights should not attach.

The final question for consideration is one of credibility. Respondent, her husband and a Mrs. Gics testified to certain alleged conversations respecting the accounts. In so far as these were supposed to have been with her, or to have taken place in her presence, the petitioner categorically denied most of this testimony and gave a very different version of the remaining occurrences. A distinct issue of credibility of the opposing witnesses was thus raised, or to speak more exactly, in view of the location of the burden of proof, as hereinbefore discussed, an issue was raised as to whether the credibility of respondent, her husband and this other woman was sufficient to overbear the inferences against her. This issue must be decided against the respondent.

It is at times somewhat difficult to detect misstatements by witnesses, particularly where testimony has been carefully rehearsed in advance; nevertheless it is a fact familiar to all who have had any considerable experience in the weighing of evidence that no matter how diligent the pre-trial preparation, witnesses who are tampering with the truth will involve themselves in inconsistencies and contradictions if they can only be induced to talk long enough. If contradictions are thus made in respect to material matters, they may, if of a sufficiently serious nature, result in the application of the familiar principle "*falsus in uno, falsus in omnibus*" (*Moett* v. *People*, 85 N. Y. 373, 377; *Deering* v. *Metcalf*, 74 id. 501, 506, 507; *Matter of Davis*, 142 Misc. 681, 686), with the consequent rejection of all testimony on behalf of the offending party. A few of the portions of the testimony on behalf of respondent which make these observations presently pertinent will be noted.

Respondent and her husband testified that the day after decedent's arrival at their house, decedent requested the husband to go to her former residence to secure the bank books, and that upon his return with them the following conversation took place between the husband, respondent and decedent: " My husband said to my mother, ' How is it that the accounts are in Mary's name? ' And mother said * * *." The husband testified: " I said to her mamma, are you aware of the fact, because I called her mother the same as I would my own mother * * *, that two of these books are not on your name alone. One is a joint account with Mary and one is a trust account with Mary. And she said * * *."

The inevitable connotation of these statements is that the hus-

band and wife having then, for the first time, learned of this condition of the books, sought information on the subject from the decedent, being surprised at her giving this control over her assets to the other daughter. It was, however, definitely established by the testimony of the respondent herself that she knew of the form in which the accounts stood at least three or four months before this time, while her mother was living by herself; that she had the books in her possession at that time, knew how they read, and her mother had told her about them. Although the respondent categorically denied on redirect examination that she had known of the contents of the books prior to three or four months before the death, she admitted under cross-examination that she had seen the books about the month of May, 1930, and her husband testified that he learned about them in September or October, 1932, and heard the decedent tell the respondent about them.

The respondent testified that she *went* to the bank two or three days after the decedent's arrival to attempt to have the sister's name removed from the books; but it was later developed on cross-examination that she only *wrote* at that time, her husband typewriting the letter.

Considerable stress was laid by all of respondent's witnesses on alleged loans by the decedent to Mary, and testimony was given of alleged statements by the decedent that neither they nor any installments thereof were repaid. It was, however, irrefutably demonstrated by petitioner's Exhibits 12 and 13 that the $3,000, which was the chief loan asserted and which was identified as being secured by a mortgage on petitioner's home, was satisfied on April 29, 1930, more than three years prior to the time that the statements by decedent were testified to as having been made, and that petitioner had made periodic payments on the principal of the mortgage, which were duly receipted for over the admitted signature of the decedent.

Many other instances of irreconcilable discrepancies in the testimony on behalf of respondent might be given, but it will be sufficient to call attention to the fact that the only entirely credible witness who gave evidence respecting a material matter, Rev. Andrew Stefenick, wholly failed to corroborate her version of the alleged happenings at a conference in the parish house between the parties.

There remains for brief note the testimony of Mrs. Gics. Emphasis was placed on her testimony on the ground that she was a technically disinterested party. It appeared, however, that she was an intimate friend of the respondent and came to the house solely to visit her; that although she had known decedent for

eighteen years, she had not visited her and had not seen her for five years before the time when it is claimed that these intimate disclosures respecting her personal affairs took place.

In the opinion of the court her testimony is entitled to no greater credence than that of the respondent and her husband. It seems wholly improbable that this reticent and self-reliant old lady should have unburdened herself respecting her personal affairs to this comparative stranger, when she was never known to do such a thing before; furthermore, while the version of this witness of the alleged conversation corresponded closely, including the discrepancies of fact hereinbefore noted respecting the testimony of the respondent and her husband, with that given by them, the court believes this to be due rather to consultation between the witnesses than to actual fact. However this may be, the testimony contributed nothing in any case toward the establishment of the sole pertinent issues in the case of whether or not the petitioner agreed with the respondent to hold the avails of the accounts in trust for the estate or whether she exercised fraud or undue influence on the decedent in connection with their inception.

It follows on the full record that no credible demonstration has been made which would vary the natural devolution of the avails of these accounts. The granting of the petition is rendered the more inevitable by the concession in respondent's brief that the evidence to which objection was duly made, and which was received subject thereto of the statements of decedent tending to show her intent as to these deposits, not made in the presence of Mary Macunick, may be disregarded as not competent. (*Mabie* v. *Bailey*, 95 N. Y. 206, 211; *Tierney* v. *Fitzgerald*, 195 id. 433, 435; *Moskowitz* v. *Marrow*, 251 id. 380, at p. 400.)

It follows that the petition must be granted.

Proceed accordingly.